* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission as well as the report from the Industrial Commission's Nurses Section. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employee-employer relationship existed between plaintiff and defendant-employer.
3. Key Risk Management Services was the servicing agent on the risk on February 4, 2000.
4. Plaintiff sustained a compensable injury by accident or specific traumatic incident on February 4, 2000. Plaintiff's average weekly wage on February 4, 2000, resulted in the maximum compensation rate of $588.00.
5. Plaintiff's medical records, consisting of 70 pages, were received into evidence as Stipulated Exhibit 1.
6. All filings made by plaintiff and defendant with the North Carolina Industrial Commission, including Motion for Contempt and Defendant's Responses to it were received into evidence as Stipulated Exhibit 2.
7. Rehab reports produced by Key Risk Management Services, Marguerite Hill, RN, CCM, and Neal Branski, RN, CCM, consisting of 51 pages, were received into evidence as Stipulated Exhibit 3.
8. Home caregiving reports were received into evidence as Stipulated Exhibit 4.
9. Plaintiff contends the issues to be: *Page 3 
 a. Did defendant disregard the Opinion and Award of Deputy Commissioner Rowell when they denied payment for plaintiff's prescriptions for Miacalcin, Diazepam, Zyrtec, Tegaderm, and Flonase?
 b. Should defendant be required to pay for psychological and psychiatric care as provided by Dr. Mukefh Kamdar and Dr. Deborah McFarlane?
 c. Should defendant be required to pay for plaintiff's home healthcare, physical therapy, and home health assistance as recommended by plaintiff's treating physician, Dr. Kenneth Carnes?
 d. Should defendant be required to provide an adjustable hospital bed with mattress tension as recommended by Dr. Kenneth Carnes?
 e. Should defendant be required to pay for plaintiff's December 2003 hospitalization at Rex Healthcare?
 f. Should defendant be required to provide transportation for all medical appointments?
 g. Is plaintiff entitled to a 10% penalty and attorney's fees for defendant's willful and contentious denial of plaintiff's prescription medications and other medical treatment, including psychological and psychiatric care, which required plaintiff to file a Motion for Contempt, which resulted in hearings scheduled before the Industrial Commission?
 h. To what additional benefits is plaintiff entitled?
10. Defendant contends the issues to be:
 a. Are plaintiff's psychological conditions related to her February 4, 2000 injury?
 b. Are plaintiff's present medical condition and alleged disability related to her February 4, 2000 injury? *Page 4 
 c. Was plaintiff's request that defendant pay for her treatments by Drs. Kamdar and McFarlane timely?
 d. During what period of time must defendant pay for the treatment rendered by Dr. Kamdar?
 e. During what period of time must defendant pay for the treatment rendered by Dr. McFarlane?
 f. Is plaintiff's allergy medication related to her February 4, 2000 injury?
 g. Whether plaintiff's home healthcare is and has been a reasonable medical expense related to her February 4, 2000 injury?
 h. Has plaintiff's past treatment effected a cure, given relief, or lessened the period of disability?
 i. Whether plaintiff's home physical therapy is and has been a reasonable medical expense related to her February 4, 2000 injury?
 j. Should defendant be required to pay for the December 2003 hospitalization at Rex Healthcare?
 k. Has plaintiff appropriately answered the discovery requests served by defendant?
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 5 
1. At the time of the hearing before Deputy Commissioner Taylor, plaintiff was 41 years old. She is a trained nurse with all certifications for neonate through adult care. In February 2000, defendant-employer retained plaintiff at Western Wake Medical Center as a clinical supervisor in the emergency department.
2. On February 4, 2000, plaintiff sustained a compensable injury by accident arising out of and in the course and scope of her employment with defendant-employer when her right arm became trapped under a body that she was helping to move. Prior to plaintiff's compensable injury, she did not have upper extremity, neck or thoracic pain. Prior to plaintiff's compensable injury, plaintiff did not receive psychological treatment except for a brief three-month period when her grandparents were dying and she was responsible for terminating life support.
3. On February 24, 2003, Deputy Commissioner Ronnie E. Rowell heard this matter on the issue of whether or not plaintiff's treatment with Dr. Carnes was authorized, and if so, what benefits would be awarded as a result of that treatment. In an Opinion and Award issued on June 6, 2003, Deputy Commissioner Rowell found that plaintiff had sustained a compensable injury by accident to her right elbow and neck that resulted in chronic neck related problems. Dr. Carnes was approved as plaintiff's treating physician and defendant was ordered to provide all medical compensation reasonably necessary as a result of plaintiff's compensable neck related problems to the extent it tends to effect a cure, give relief or lessen her disability. Finally defendant was fined for its failure to file a Form 60 or 61.
4. This matter came before the Industrial Commission a second time upon the filing of plaintiff's Motion for Contempt and Motion for Medical Treatment on January 8, 2004. After a telephone conference before the Chief Deputy, this matter was set for hearing before Deputy Commissioner Wanda Taylor on October 4, 2004 on the issues previously set forth above. *Page 6 
5. During the course of his treatment of plaintiff since August 29, 2000, and following numerous tests, Dr. Carnes, plaintiff's authorized treating physician, found that plaintiff had mild degenerative changes on her cervical spine MRI as well as spondylosis resulting in left foraminal narrowing at C4-5, C5-6 and C6-7. Plaintiff has had brain CT scans and MRI's that have not found any abnormalities. Plaintiff has also undergone an endoscopic evaluation of her swallowing, which revealed that plaintiff has no gag reflex.
6. Dr. Robin Koeleveld and Dr. David Langer, neurosurgeons, evaluated plaintiff for one-time consultations regarding possible surgery. Neither doctor felt that plaintiff was a candidate for surgery.
7. At the time of the hearing before Deputy Commissioner Taylor, plaintiff was deconditioned, weak and experiencing vertigo and bedsores. As plaintiff testified, she continues to have intractable neck pain, thoracic pain, weakness and difficulty with swallowing as well as depression and anxiety. Based on her testimony, plaintiff also genuinely believes she has hypereflexia, parasthesia, herniation and bony growths and vertebral artery spasms. No healthcare provider has suggested that plaintiff is not credible or that she may be malingering. Accordingly, the Full Commission finds plaintiff to be a credible witness.
8. As she testified at the hearing before Deputy Commissioner Taylor, plaintiff spends approximately 22 to 24 hours in bed daily. Plaintiff has difficulty bathing and often has to lie down on the floor of the shower.
9. Plaintiff has received companion care for six hours per day, five days per week. The companions provide meal preparation, care for her pet, light housekeeping, wake-up reminders for medication and eating, transportation to medical appointments and laundry service that included washing her clothes and changing her bed once weekly. As the companions are not *Page 7 
certified nursing assistants, they are not permitted to physically assist plaintiff. Plaintiff has had to depend on her mother for assistance during the weekends as well as friends and neighbors.
10. On March 12, 2003, Dr. Carnes, plaintiff's approved treating physician, referred plaintiff to Dr. Mukesh Kamdar, a board-certified psychiatrist, because, as Dr. Carnes opined, plaintiff had reactive depression and anxiety resulting from the chronic illness and chronic pain she was experiencing due to her compensable injury and subsequent consequences.
11. On March 18, 2003, plaintiff presented to Dr. Kamdar complaining of severe back pain and stress over her job loss and other work-related issues. Dr. Kamdar diagnosed plaintiff with adjustment disorder with mixed emotional features and possibly major depression. Dr. Kamdar prescribed antidepressants.
12. On March 28, 2003, plaintiff presented to Dr. Deborah McFarlane, Ph.D., a clinical psychologist, on referral from Dr. Kamdar. Dr. McFarlane found plaintiff to be very engaged and interactive during their therapy sessions and very appropriate. Further, as Dr. McFarlane testified, plaintiff has never told Dr. McFarlane what to diagnose or what to report.
13. Plaintiff continued to see Dr. Kamdar, and on May 16, 2003, he diagnosed plaintiff with post-traumatic stress disorder and continuing depression. Dr. Kamdar opined that plaintiff had an intrusive preoccupation, repeatedly recalling a very detailed account of her compensable accident and the events thereafter and was suffering significant psychological distress about it.
14. On July 8, 2003, Dr. Kamdar wrote a letter reporting that plaintiff was anxious and frightened of having someone from workers' compensation accompanying her to her doctors' visits and was frightened of obtaining her medications from defendant-employer's pharmacy. *Page 8 
15. On December 16, 2003, plaintiff presented to Dr. Carnes with extreme anxiety, complaining of neck pain, dehydration and medication withdrawal. Plaintiff had been unable to obtain her Duragesic packs from defendant-employer and was experiencing severe withdrawal. Dr. Carnes referred plaintiff to Rex Hospital for admission and requested a psychological consult. Defendant has not paid for this hospitalization.
16. Dr. Carnes opined that plaintiff does have ongoing physical pathology with degenerative changes and significant spondylosis of the cervical spine. Furthermore, he opined that the physical findings do not indicate the amount of pain that the plaintiff is experiencing.
17. Dr. Carnes has not found plaintiff to be overly involved in her own care or seeking to inappropriately direct her own treatment. Dr. Carnes opined that repeated delays by defendant-employer and its third-party administrator in providing plaintiff's medications, physical therapy and home healthcare have compromised plaintiff's physical condition and care.
18. Dr. Carnes has prescribed the following medications for plaintiff:
 Miacalcin on December 17, 2003 to slow down plaintiff's bone loss. Plaintiff's compensable injury caused pain which Dr. Carnes' opined caused plaintiff to become deconditioned and that deconditioning has led to a chronic loss of weight and a need to stop bone loss in plaintiff.
 Flonase and Zyrtec on December 17, 2003 for plaintiff's seasonal allergies. Dr. Carnes opined that if plaintiff does not take allergy medication she is put at risk for worsening allergies such as a chronic cough that with her level of deconditioning would worsen her pain and place her at a risk for stress fractures. Plaintiff has been treated with allergy medications including Claritin and Flonase since October 5, 1995.
 Tegaderm on August 11, 2004 to promote wound healing. As plaintiff has been functionally bedridden, she has had skin breakdown in certain areas and needs this medication for treatment of bedsores. *Page 9 
 Diazipan to treat muscle spasms as a muscle relaxant and to treat plaintiff's anxiety.
 Depo-Provera was prescribed for plaintiff for abnormal/prolonged menstrual bleeding. Dr. Carnes opined, after consultation with plaintiff's gynecologist, Dr. Dingman, that plaintiff was at risk for this condition because of her chronic illness. Dr. Carnes also opined that this medication can and did improve plaintiff's appetite and may prevent further weight loss. Plaintiff had experienced heavy dysfunctional menstrual bleeding as early as September 17, 1992.
19. According to Dr. Carnes, plaintiff is unable to get up and fix meals or something to drink because of the length of time she has been bedridden and supine on her back even though it would be beneficial for plaintiff to get up more if she could tolerate doing so without significant pain. However, according to Dr. Carnes, plaintiff has significant pain that makes her unable to do so.
20. On January 22, 2004, Dr. Carnes prescribed home healthcare for plaintiff for eight hours per day. On May 6, 2005, Dr. Carnes continued the prescription for home healthcare for eight hours per day and added weekends. Dr. Carnes wrote his most recent prescription for home health care for plaintiff on September 26, 2005, which states six hours per day. Dr. Carnes opined that plaintiff had become so chronically deconditioned and ill and had such chronic pain that she would struggle with meal preparation, housecleaning and personal hygiene. He further opined that plaintiff needed help cleaning sheets, doing laundry, obtaining groceries, preparing meals, cleaning house and with personal hygiene and that although plaintiff was physically able to drive, it exacerbated her pain and was difficult.
21. Karen Smith of the North Carolina Industrial Commission's Nurses Section met with plaintiff, Dr. Carnes, Kim Brown, RN, who conducted a home evaluation and spoke with *Page 10 
numerous other health care providers, as documented in her report. In addition, Ms. Smith reviewed plaintiff's extensive medical records.
22. Nurse Smith concurred with Dr. Carnes' recommendation that plaintiff receive home health assistance for six hours per day, seven days per week. As Dr. Carnes clarified with Ms. Smith, this would include someone to monitor plaintiff's skin integrity, her blood pressure, assisting with placement of plaintiff's TENS pads, preparing nutritious meals and encouraging plaintiff to eat and drink, encouraging activity that would increase overall endurance and assisting with daily hygiene, many of these services have not been previously provided as they require a certified nursing assistant. As documented in Ms. Smith's report these services should include more active, hands-on care that would encourage greater activity on plaintiff's part and decrease her time in bed. The Full Commission finds this recommendation, as also prescribed by plaintiff's authorized physician, Dr. Carnes, to be reasonably necessary to effect a cure or give relief and to lessen the period of disability.
23. As documented in the report of the Industrial Commission's nurse, Ms. Smith, no home health assessment had ever been done in plaintiff's home as defendant had decided that plaintiff could perform her own personal care without assistance according to a functional capacity evaluation performed in 2001.
24. On February 16, 2004 and March 22, 2004, Dr. Carnes prescribed at-home physical therapy for plaintiff because it was very difficult for plaintiff, due to her deconditioned state and pain, to travel for physical therapy. Dr. Carnes opined that physical therapy would help plaintiff with her chronic pain, range of motion and overall well-being. Defendant has not provided at-home physical therapy for plaintiff as prescribed by plaintiff's authorized physician, Dr. Carnes. *Page 11 
25. On July 13, 2004, Dr. Carnes prescribed neuromuscular massage for plaintiff. He has done so many times for other patients in an effort to alleviate pain, increase range of motion and decrease muscle spasms. Plaintiff requested to have her neuromuscular massage performed at Dunn Physical Therapy, which the Full Commission finds to be reasonable. Although prescribed by Dr. Carnes, defendant has not provided the neuromuscular massage for plaintiff. The Full Commission finds neuromuscular massage to be reasonably necessary to effect a cure or give relief and will tend to lessen plaintiff's period of disability.
26. On May 18, 2004 and on November 4, 2004, Dr. Carnes prescribed a hospital bed for plaintiff. Dr. Carnes opined that since plaintiff is essentially bedridden, a hospital bed is necessary to help her change positions, get in and out of bed, to reduce the risk of bed sores, to help her sleep and to help her eat more. According to the report from the Industrial Commission's nurse, plaintiff purchased the hospital bed herself although it had been prescribed by Dr. Carnes and recommended by physical therapists that had visited plaintiff's home in 2004. The Full Commission finds a hospital bed to be reasonably necessary to effect a cure or give relief and will tend to lessen plaintiff's period of disability.
27. Dr. Carnes further opined that plaintiff needs transportation to get to and from her medical appointments. The Full Commission finds transportation to be reasonably necessary to effect a cure or give relief and will tend to lessen plaintiff's period of disability.
28. On March 16, 2004, plaintiff presented to Dr. Moira Artigues, a board-certified general and forensic psychiatrist, at the request of defendant. In addition to this one-time evaluation of plaintiff that took approximately three hours, Dr. Artigues spoke with plaintiff on the phone a few days later for approximately 20 minutes. Following this evaluation, Dr. *Page 12 
Artigues diagnosed plaintiff with major depressive disorder, single, severe and without psychotic features.
29. Dr. Artigues opined that plaintiff's depression is at least an indirect result of her compensable injury at work and the resulting consequences. Dr. Artigues did not agree with the opinion of Dr. Siegel, a neurologist who performed an independent medical examination for defendant on March 19, 2004, who opined that plaintiff's conversion disorder or plaintiff's depression is not a result of her work-related injury.
30. Dr. Artigues found that plaintiff's disabling factor was her neck pain but that plaintiff's coping ability is poor. Dr. Artigues opined that plaintiff feels helpless and depressed and this helplessness inspires rage that is not uncommon or unreasonable in a person such as plaintiff. Dr. Artigues noted that plaintiff has also experienced severe stress in trying to obtain treatment.
31. Dr. Artigues further opined that plaintiff believes she has chronic pain and that one feature of her depression is enhanced pain. However, in Dr. Artigues' opinion, plaintiff's pain cannot be treated until her depression is more effectively under control.
32. As Dr. Artigues testified, plaintiff is receiving helpful treatment from Dr. McFarlane and needs continuing psychiatric and psychological treatment for crisis management so that she can explore her psychological issues including her passivity and victim's role.
33. On March 19, 2004, plaintiff, at the direction of defendant, presented to Dr. Jeffrey Siegel, a neurologist, for an independent medical evaluation. Dr. Siegel opined plaintiff has conversion disorder that was not caused by her compensable injury by accident. He noted that plaintiff had no objective physical findings to explain her symptoms, no ongoing permanent physical impairment, no physical diagnosis and no need of future medical treatment. *Page 13 
34. Dr. Siegel further opined that plaintiff's conversion disorder, probable borderline personality and major depression are not related to her injury by accident and that plaintiff has not been helped by her treatment with Dr. Carnes or Dr. Kamdar. However, Dr. Siegel opined that plaintiff is not malingering.
35. At the time of her deposition, Dr. McFarlane was contemplating changing plaintiff's diagnosis to major depression or mood disorder with accompanying medical condition. Dr. McFarlane opined that plaintiff's medical condition; i.e., her pain, is a major piece of her condition and that plaintiff is experiencing depression, anger and anxiety as a result. Dr. McFarlane further opined that plaintiff's depression is a result of dealing with the losses she has incurred as a result of the injuries she suffered at work, including her loss of employment, loss of self-esteem, loss of self-worth and loss of ability to perform regular activities.
36. Dr. McFarlane's testified that her goal in treating plaintiff is to try to get her to bring her level of exaggerated emotion to a more stable condition. According to Dr. McFarlane, plaintiff's emotional level is so heightened that her therapy is aimed at attempting to lower plaintiff's emotional level to reduce physical tension and some of the pain in an indirect way that will allow plaintiff to better cope with her pain.
37. Dr. McFarlane observed that during plaintiff's treatment, her rage is less and she is focusing less on her anger at her inability to obtain treatment and the way she has been treated and focusing more on quality of life and emotional responses.
38. Dr. McFarlane opined that the facts plaintiff reports are true to her, that plaintiff will benefit from continued therapy and that there is a substantial likelihood that plaintiff will require supportive therapy in the future to increase her level of function and reduce her level of despair and depression. Dr. McFarlane also opined that even if plaintiff had fallen and injured *Page 14 
herself at home to the same degree resulting in the same limitations that she currently experiences, she would still have needed the same level of psychiatric and psychological treatment. Dr. McFarlane recommended that plaintiff receive therapy once a week, or at a minimum, once every two weeks.
39. Dr. McFarlane disagrees with Dr. Siegel's diagnosis of conversion disorder and believes that his opinions would have been different if he had seen plaintiff longer. However, Dr. McFarlane does agree with Dr. Artigues' diagnosis of major depressive disorder.
40. Dr. Carnes disagrees with Dr. Siegel who opined that plaintiff has no physical pathology, does not need to be out of work and needs no further medication. Furthermore, Dr. Carnes disagrees with Dr. Siegel's diagnosis of conversion disorder and believes that you just need to look at plaintiff to realize that she needs treatment. Dr. Carnes also testified that he does not believe plaintiff is malingering.
41. Dr. Carnes opined that plaintiff's December 16, 2003 admission to Rex Hospital for neck pain, dehydration and medication withdrawal was urgent, and that plaintiff had uncontrolled pain, anxiety and hysteria at that time.
42. Dr. Carnes did not believe that plaintiff's anger and frustration contributed to her disability but he did think that the third-party administrator in this matter, and defendant-employer have been unnecessarily biased against plaintiff.
43. Dr. Carnes testified that plaintiff suffered from reactive depression and anxiety issues from her chronic illness and from her chronic pain.
44. Dr. Carnes opined that plaintiff's prognosis is guarded at best, as she has been chronically ill for years with intractable pain and resulting deconditioning. Dr. Carnes testified *Page 15 
that plaintiff's treatments stabilized, but have never cured, her condition, and that plaintiff will never return to her prior functional level as a nurse.
45. The Full Commission gives greater weight to the opinions of Drs. Carnes, Artigues and McFarland over the opinion of Dr. Siegel. According to Dr. Siegel's own testimony, his actual examination of plaintiff was limited to only 15 or 20 minutes while Drs. McFarlane and Carnes examined plaintiff on numerous occasions. Moreover, when evaluating plaintiff's depression and anxiety, the Full Commission finds that Dr. Artigues, a board certified psychiatrist, is more qualified to evaluate these issues rather than Dr. Siegel, a neurologist, and accordingly, gives greater weight to the opinion of Dr. Artigues.
46. Although plaintiff may, at one point, have been physically able to get out of bed and be more physically active, she has been unable to function physically, due to her pain, depression and anxiety caused by her compensable injury and the resulting consequences. The greater weight of the medical evidence reveals, and the Full Commission so finds, that plaintiff's original compensable conditions and severe deconditioning which have directly resulted, have made plaintiff severely and profoundly disabled and functionally bed ridden.
47. The greater weight of the medical evidence also reveals, and the Full Commission finds that plaintiff's depression and other psychological issues were caused by her compensable injury and her resulting loss of function. Defendant's mishandling of this claim has contributed to, but was not the sole cause of plaintiff's psychological issues.
48. The Full Commission finds that continued treatment of plaintiff's depression and other psychological issues caused by her response to the pain from her compensable injury and her loss of function is reasonable and necessary to effect a cure or give relief and will tend to *Page 16 
lessen plaintiff's period of disability. In turn, treatment will increase plaintiff's ability to function, potentially improving her condition and providing some rehabilitation.
49. The Full Commission further finds that although plaintiff is a skilled nurse and has been active in her care, she has not made unreasonable requests and her involvement in her care has been reasonable and appropriate under the circumstances.
50. Plaintiff has been the subject of surveillance by defendant on many occasions. Five days of surveillance were performed on plaintiff in New York beginning May 20, 2004. Surveillance was taken on May 20, 21, 22, 27 and 28. Over this period, plaintiff was observed for approximately 24 hours with only two hours of video taken. During the course of this surveillance, for approximately a one-hour period, plaintiff was observed waiting at the airport in a wheelchair, walking slowly with another woman and child and returning to the airport, where she was again seated in a wheelchair. The Full Commission finds that the timeframe of this evidence is too short to be of much significance and accordingly gives it little weight.
51. The Full Commission finds that the condition for which plaintiff presented to Dr. Carnes on December 16, 2003 and which necessitated her admission to Rex Hospital was caused by plaintiff's compensable injury and defendant's failure to provide plaintiff with medications on a timely basis.
52. The Full Commission finds that plaintiff's treatment for her pain and psychological condition have provided relief and lessened her disability. This treatment has slowed the worsening of plaintiff's condition, will likely improve plaintiff's quality of life leading to improved pain control, and is necessary and essential to keep plaintiff from becoming further debilitated. *Page 17 
53. The Full Commission finds that as direct and proximate result of plaintiff's February 4, 2000 compensable injury and the conditions resulting therefrom, plaintiff has been unable to engage in employment or earn the same or any other wage with defendant or any other employer since October 11, 2002.
54. Based on the report of the Industrial Commission's nurse, Ms. Karen Smith, the Full Commission finds that the medical rehabilitation professional is appropriately managing plaintiff's case and should continue to do so.
55. The Full Commission further finds that plaintiff is entitled to six hours of attendant care for seven days per week as recommended by Dr. Carnes.
56. Plaintiff's average weekly wage on February 4, 2000 resulted in the maximum compensation rate of $588.00 per week.
57. The Full Commission finds that defendant defended this claim without reasonable grounds and has been unreasonably litigious. Defendant has refused to approve written prescriptions from plaintiff's authorized treating physician for attendant care, medical services and medication. Furthermore, defendant failed to pay for plaintiff's December 16, 2003 hospitalization at Rex Hospital that was necessitated because of plaintiff's inability to obtain prescribed medications from defendant on a timely basis. Defendant has presented no evidence that such care, services and medications prescribed by plaintiff's authorized doctor were not medically necessary, other than the testimony of Dr. Siegel, a neurologist, who only saw plaintiff on one occasion for fifteen or twenty minutes on March 19, 2004 for an independent medical examination requested by defendant.
 * * * * * * * * * * * *Page 18 
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 4, 2000, plaintiff sustained a compensable injury by accident arising out of and in the course and scope of her employment with defendant-employer when her right arm became trapped under a body that she was helping to move. As a direct and proximate result of plaintiff's February 4, 2000 compensable injury, plaintiff sustained right upper extremity and neck injuries. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's compensable injuries to her neck and right upper extremity and the resulting intractable pain, plaintiff has developed depression, anxiety and other psychological conditions and has become severely deconditioned and functionally bed ridden. N.C. Gen. Stat. § 97-2(6).
3. As a direct and proximate result of plaintiff's February 4, 2000 compensable injury and the conditions resulting therefrom, plaintiff has been unable to engage in employment with defendant-employer or any other employer and is entitled to total disability compensation in the amount of $588.00 per week beginning October 11, 2002 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of her compensable injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including treatment for plaintiff's pain, depression, anxiety, other psychological conditions, physical limitations and deconditioning. This would include payment for plaintiff's December 16, 2003 admission to Rex Hospital; home healthcare for six hours per day, seven days a week, with all or part of the services provided by a certified nursing assistant; *Page 19 
at-home physical therapy; neuromuscular massage; a hospital bed, transportation for appointments, psychological/psychiatric treatment with Dr. Kamdar and Dr. McFarlane or any other psychologist or psychiatrist to whom she may be referred by Dr. Carnes; and payment for the following medications: Miacalcin, Tegaderm, Diazipan. Dr. Carnes is approved as plaintiff's treating physician. N.C. Gen. Stat. §§ 97-2(19);97-25.
5. Plaintiff is entitled to an award of attorney fees in the amount of $2,000.00 because defendant's actions were not based upon reasonable grounds. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $588.00 per week beginning October 11, 2002 and continuing until further Order of the Commission. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter approved.
2. For so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability, defendants shall pay all medical expenses incurred and to be incurred as a result of plaintiff's compensable injury by accident on February 4, 2004, including treatment for plaintiff's pain, depression, anxiety, other psychological conditions, physical limitations and deconditioning. This would further include payment for plaintiff's December 16, 2003 admission to Rex Hospital; home healthcare for six hours per day, seven days a week, with all or part of the services provided by a certified *Page 20 
nursing assistant; at-home physical therapy; neuromuscular massage; a hospital bed; transportation for appointments; psychological or psychiatric treatment with Dr. Kamdar and Dr. McFarlane or any other physician to whom plaintiff may be referred by Dr. Carnes; and payment for the following medications: Miacalcin, Tegaderm, Diazipan. Dr. Carnes is approved as plaintiff's treating physician.
3. Plaintiff is not entitled to have defendant provide Flonase, Zyrtec and Depo-Provera as plaintiff needed these medications prior to her compensable injury.
4. An attorney's fee of 25% of the compensation awarded to plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
5. Defendant shall pay a reasonable attorney fee in the amount of $2,000.00 to plaintiff's counsel as part of the cost of this action.
6. Defendant shall pay all other costs of this action.
This the ___ day of March 2007.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN *Page 1